Joseph **WYBLE**; Robert May; Robert Hames; Winston Land & Cattle Company, Inc.; Snider Industries LLP; Snider Timberland FLP; Terry McKenzie, for and on behalf of the Hemby Living Trust; M. Kangerga & Bro.; and Kim R. Smith Logging, Inc.

v.

**GULF SOUTH PIPELINE COMPANY, L.P., and GS Pipeline Company, L.L.C.**

Civil Action No. 9:02–cv–200.

United States District Court, E.D. Texas, Lufkin Division.

March 4, 2004.

Robert M. Parker, Tyler, TX, pro se.

Amelia Susan Harris, R. Michael McCauley, McCauley, MacDonald & Devin, Fred Misko, Jr., Law Offices of Fred Misko, Jr., Charles E. Ames, Edward Chin, Fred Misko, Jr, PC, Dallas, TX, Claude Edward Welch, Law Offices of Claude E. Welch, Clayton Edward Dark, Jr., Attorney at Law, George Edmond Chandler, Chandler Law Offices, Lufkin, TX, James LaVoy Branton, Thomas Andrew Crosley, Branton & Hall, San Antonio, TX, Samuel Issacharoff, Attorney at Law, New York, NY, Michael Edwin Jones, Potter Minton, Tyler, TX, Arthur R. Miller Board of Bar Overseers No. 554226, Cambridge, MA, for Plaintiffs.

Jennifer Parker Ainsworth, Wilson, Sheehy, Knowles, Robertson & Cornelius, PC, Walter Thomas Henson, Ramey & Flock, Tyler, TX, Robert Elkin, Robert E. Goodfriend, McKool Smith, Dallas, TX, Samuel Franklin Baxter, McKool Smith, PC, Marshall, TX, Michael E. McMahon, Attorney at Law, Houston, TX, Patricia Fry Godley, Van Ness Feldman, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

Before the Court is Defendants' Motion for Partial Summary Judgment on Article III Standing with Respect to Remote Violations (Document No. 134), Plaintiffs' Response, and the parties' replies and sur-replies. Having carefully considered the parties' filings, the oral arguments of counsel, and the applicable law, the Court GRANTS Defendants' motion.

## BACKGROUND AND PROCEDURAL HISTORY

Since November 10, 1992, Defendants have effectively owned and operated natural gas pipelines that span over 8,000 miles from Texas to Florida. From 1993 until early 2001, the company operated as Koch Gateway. In 2001, the company's name was changed to Gulf South Pipeline Company, L.P. ("Gulf South"). At the time of the name change, GS Pipeline Company, L.L.C. was formed and became Gulf South's general partner. Soon thereafter, in February 2001, both entities became wholly owned subsidiaries of Entergy–Koch, LP.

Plaintiffs are nine residents and landowners in East Texas through whose property Defendants' pipelines run. Plaintiffs allege ongoing injuries caused by Defendants' failure to maintain and monitor its pipelines as required by the Natural Gas Pipeline Safety Act, 49 U.S.C. § 60101 et seq. ("PSA") and the related regulations contained in 49 C.F.R. 192 (2000).

On July 26, 2002, four Plaintiffs, Joseph Wyble, Robert May, Robert Hames, and Winston Land & Cattle Co., filed their original complaint, seeking injunctive relief pursuant to the citizen suit provision of the Pipeline Safety Act, 49 U.S.C. § 60121. On May 27, 2003, six new Plaintiffs, Jacksonville ISD[1], Snider Industries, LLP, Snider Timberland, FLP, Hemby Living Trust, M. Kangerga & Bro., and Kim R. Smith Logging, Inc., were added as class representatives under Plaintiffs' First Amended Complaint. Plaintiffs claimed the pipeline running through their property led to the specific injury of a corroded and otherwise unsafe pipe in violation of the PSA. Plaintiffs further contended that this specific injury was symptomatic of a company policy and ethic in which maintenance and education in compliance with the PSA is not performed. The named plaintiffs sought to represent a class of similarly situated individuals who resided on or owned property along Defendants' 8,000 miles of pipeline from Texas to Pensacola, Florida.

Defendants filed a motion to dismiss which this Court denied on December 18, 2002. Based on the allegations of Plaintiffs' then-live complaint and the evidence filed in support of their Response to Defendants' motion to dismiss, the Court opined that Plaintiffs satisfied all elements of constitutional standing to pursue two distinct claims. The first was for violations on the pipeline running through the land in which they have a proprietary interest, or direct injuries. The second was for a system-wide failure to monitor and

---

1. Jacksonville ISD later submitted a stipulation of voluntary dismissal with prejudice to its claims. The Court entered an order granting the dismissal, and Jacksonville ISD was terminated per court order on January 16, 2004.

maintain the pipeline due to a company policy or ethic of putting profits ahead of compliance. However, on June 6, 2003, when Plaintiffs' motion for class certification was due, Plaintiffs filed a Second Amended Complaint, abandoning its class action allegations. Because the Court's December 18, 2002 Order denying Defendants' motion to dismiss was based on an alleged class action, the Court then had to determine whether Plaintiffs had standing to bring claims for violations on the property of others absent a class action.

In June and July, 2003, the parties submitted briefs on their positions as to Plaintiffs' efforts to seek system-wide injunctive relief under the citizen suit provision of the PSA absent class action allegations. In their briefing, Plaintiffs alleged various theories of standing for the first time. First, Plaintiffs claimed they could seek enforcement system-wide because they "stood in the shoes" of the Attorney General of the United States. Next, Plaintiffs claimed they could act as private attorneys general and represent all Americans and passers-by on the pipeline. Defendants argued that such standing was not allowed without benefit of a class action. Plaintiffs appeared to subsequently abandon these first two theories in their filings. Plaintiffs then claimed they had standing to obtain injunctive relief for so-called "remote violations," for violations of the pipeline not only on their property, but for Defendants' violations anywhere along the 8,000 miles of its pipeline that placed Plaintiffs at immediate risk of injury on their own properties. Again, Defendants claimed that, absent class action certification, Plaintiffs did not have standing to bring these remote violations and could seek injunctive relief only as to their particular injuries on their properties.

On July 28, 2003, a hearing was held before the Honorable John Hannah regarding Plaintiffs' standing under the PSA's citizen suit provision following Plaintiffs' decision to abandon class certification. The Court ultimately withheld its ruling on the standing issue pending further discovery. On July 29, 2003, the Court ordered that system-wide discovery was to proceed to include information and issues relating to the entire pipeline in order for the Court to properly determine the standing/jurisdictional issue. The Court opined that Defendants were not precluded from raising the jurisdictional issue again following the completion of discovery, but that even if the Plaintiffs did not have standing to assert damages and seek relief for unnamed citizens along the pipeline, such evidence would be circumstantial and highly useful to the named Plaintiffs in their case. The Court also found that such evidence might very well be useful to the Court in fashioning any injunctive remedy that the Court found necessary in regard to the named Plaintiffs' cause of action.

Ten days later, on August 8, 2003, Plaintiffs filed a motion for limited preliminary injunction and emergency hearing alleging that Defendants' pipeline crossing the property of a non-party, the Huntsville Independent School District ("HISD"), was unsafe. Plaintiffs sought to shut the pipeline down right before school commenced. No Plaintiff lived near Huntsville and none alleged any connection to HISD or its property. Neither the Jacksonville Independent School District or any of the other Plaintiffs sought a preliminary injunction as to their own properties. The Court set the hearing on the motion for August 15, 2003. Defendants filed a response to Plaintiffs' motion, demonstrating that the pipeline crossing the HISD property was buried at a safe depth, much deeper than Plaintiffs' expert had reported, and was properly maintained and operated under the PSA. Plaintiffs' counsel then sought to withdraw their request for a hearing on the motion on August 15,

2003, the day the hearing was set. The Court proceeded with the hearing and, while little time was devoted to the motion for limited preliminary injunction at the hearing, Plaintiffs declined to withdraw the motion because, they argued, more discovery was needed. The Court allowed the motion to remain on the docket pending the completion of discovery on the HISD preliminary injunction issue. Plaintiffs formally withdrew the motion for limited preliminary injunction on December 23, 2003.

Also at the August 15, 2003 hearing, Judge Hannah heard arguments on Defendants' motion for reconsideration of the Court's failure to rule on suggestion of parties that the Court lacks subject matter jurisdiction. The Court never formally acted on this motion, but did state,

> I think we have all admitted that I have jurisdiction to at least part of this case, at least to the Plaintiffs that are named and to the properties they're complaining about. As to whether or not I have subject matter jurisdiction to the rest of the case is always a pending issue before this Court, and at some time I might very well decide that I do not have jurisdiction over the rest of the pipeline.

Hr'g Tr., Aug. 15, 2003.[2]

On January 29, 2004, in compliance with the scheduling order regarding dispositive motions, Defendants again raised the issue by filing the instant motion for summary judgment on Article III standing with respect to the remote violations. In Plaintiffs' Second Amended Complaint, which Defendants base their summary judgment motion on, Plaintiffs claim they have standing for "remote violations" of the pipeline, anywhere along the 8,000 miles of pipeline, that placed Plaintiffs at immediate risk of injury on their own properties. However, in their response, Plaintiffs once again appeared to abandon their current standing theory, advising that "Plaintiffs do not seek injunctive relief to correct the specific violations on the out-of-state pipeline indexes." Pls.' Resp., at 3. Further, Plaintiffs attempted to adopt yet another basis for standing, asserting in their response that their injuries were not limited to the conditions of their *own properties*, but extended to various counties in East Texas where pipeline indexes are located which caused them injury. *Id.*, at 58–60. However, Plaintiffs did not seek leave to amend their pleadings at the time they filed their response.

On the eve of the summary judgment hearing, Plaintiffs' sought leave to file a Third Amended Complaint which paralleled their summary judgment Response in focusing Plaintiffs' claims away from the entire natural gas pipeline from Texas to Florida to the pipeline indexes in East Texas.[3] At the summary judgment hear-

---

**2.** Due to the death of Judge Hannah, this case was assigned to the Honorable Leonard Davis on December 9, 2003.

**3.** On February 20, 2004, eight months after the deadline for amending pleadings, just two weeks before trial of this case, and three weeks after Defendants filed their motions for partial summary judgment, Plaintiffs sought leave to file Plaintiffs' Third Amended Complaint. The justification for the arguably late filing was "to refine their factual allegations with regard to newly discovered evidence of danger and safety violations" and to "clarify and to define exact remedies requested of the

Court in light of recent discovery." Pls.' Mot. For Leave to File Pls.' Third Am. Compl., at ¶ 4. In oral arguments at the summary judgment hearing, Plaintiffs' counsel represented that the purpose was to "narrow down and clean the pleadings ... where it would focus more clearly on the remedy that we seek for these Plaintiffs in East Texas and to identify the area of remedy more clearly as to the indexes and pipelines which affect these particular plaintiffs which are in East Texas...." Tr. of Summ. J. Hr'g., at 4.

ing, both parties devoted considerable oral argument to the "remote violations" standing issue under Plaintiffs' Second Amended Complaint, and to Plaintiffs' "new" theory of standing, which purported to limit Plaintiffs' injuries not only to alleged dangerous pipeline conditions on their own properties, but to places in East Texas that they happened upon.[4] Plaintiffs complained that the approximately 1,000 miles of pipeline interconnected with the lines that cross Plaintiffs' properties are affected by the same adverse company policies and conditions affecting the pipe running through their own lands.

Defendants objected to the filing of Plaintiffs' proposed Third Amended Complaint, arguing that Plaintiffs' untimely attempt to avoid summary judgment with an amended complaint should be denied. Defendants also objected to Plaintiffs' proposed Third Amended Complaint wherein it alleged violations of six other Regulations never before pleaded. Because the deadline for amending pleadings had long passed, because the discovery deadline had passed, and because Defendants had already filed a motion for summary judgment, the Court denied Plaintiffs leave to file a Third Amended Complaint as untimely. *See* Order, Feb. 27, 2004.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt–Campbell, Inc. v. RxP Products, Inc.,* 164 F.3d 957, 961 (5th Cir.1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Merritt–Campbell, Inc.,* 164 F.3d at 961. When ruling on a motion for summary judgment, the Court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Merritt–Campbell, Inc.,* 164 F.3d at 961.

The party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (quoting *Celotex,* 477 U.S. at 323–25, 106 S.Ct. 2548). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little,* 37 F.3d at 1075. If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on

---

4. In their Original Complaint, First Amended Complaint, and Second Amended Complaint, Plaintiffs claimed loss of enjoyment of their own properties. In their summary judgment response and in their proposed Third Amended Complaint, Plaintiffs appeared to drop their claim for an injunction affecting Defendants' entire natural gas pipeline system from Texas to Florida. However, the proposed third amended complaint asserted for the first time a new basis for standing, that pipeline indexes crossing not only the Plaintiffs' properties, but other pipeline indexes in Texas expose Plaintiffs to harm and injury because they travel to work, school and visit family and friends in counties where the indexes are located. Pls.' Resp., at 2.

file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *EEOC v. Texas Instruments, Inc.,* 100 F.3d 1173, 1180 (5th Cir.1996); *Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1046–47 (5th Cir.1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita,* 475 U.S. at 585, 106 S.Ct. 1348; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075.

## DISCUSSION OF LEGAL PRINCIPLES

### The Citizen Suit Provision of the Pipeline Safety Act

The "citizen suit" concept was born in 1970, when Congress added a provision to the Clean Air Act, allowing private citizens access to the courts. Pub.L. No. 91–604 § 12(a), 84 Stat. 1706 (1970) (codified as amended at 42 U.S.C. § 7604 (1994)). Since then, Congress has endowed nearly all environmental statutes with citizen suit provisions, modeled after the Clean Air Act, whereby private citizens may bring civil actions against polluters or agencies which fail to perform their mandatory statutory duties.[5] The PSA, at issue in this case, also includes such a provision. The Act provides, in relevant part, that "A person may bring a civil action in an appropriate district court of the United States for an injunction against another person ... for a violation of this chapter or a regulation prescribed or order issued under this chapter." 49 U.S.C. § 60121(a)(1).

### Issue Presented

Much debate has ensued between the parties over the scope of the citizen suit provision. Plaintiffs contend that the citizen suit provision of the PSA is broad, and designed to confer standing to bring suit on any injured person with an interest in pipeline safety.[6] Defendants concede that Plaintiffs have standing under the citizen suit provision of the PSA to pursue injunctive relief for alleged violations of the PSA that affect Plaintiffs' enjoyment and use of their own property. Plaintiffs argue that this concession ends the standing inquiry and that Defendants have confused standing with scope of the relief, which should not be determined until a full trial on the merits. However, Defendants dispute that Plaintiffs have standing to seek injunctive relief for remote violations for which they contend Plaintiffs have no injury in fact.

### Applicable Law

The issue of a plaintiff's standing is a threshold matter that federal courts must address before considering the merits of the parties' claims. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Generally, a plaintiff's injury should relate to his or her own rights and

---

**5.** *See, e.g.,* Clean Water Act, 33 U.S.C. § 1365 (1994); Emergency Planning and Community Right–to–Know Act of 1986, 42 U.S.C. § 11046(a) (1994); Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6972 (1994); Noise Control Act of 1972, 42 U.S.C. § 4911 (1994); Safe Drinking Water Act, 42 U.S.C. § 300j–8 (1994 & Supp. III 1997); Endangered Species Act, 16 U.S.C. 1540 (1994); Toxic Substances Control Act, 15 U.S.C. § 2619 (1994); Surface Mining Control and Reclamation Act of 1977, 30 U.S.C.

§ 1270 (1994); Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. § 1415(g) (1994); Deepwater Port Act of 1974, 33 U.S.C § 1515 (1988); Outer Continental Shelf Lands Act, 43 U.S.C. § 1349 (1994); and Hazardous Liquid Pipeline Safety Act of 1979, 49 U.S.C. § 60121 (1994).

**6.** *See* 122 Cong. Rec. 32, 725 (1976) (comments of Rep. Staggers) (noting the benefit of enlisting the aid of citizens who live along the pipelines in monitoring pipeline safety).

not the rights of third parties. *See Miller v. Albright,* 523 U.S. 420, 445, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998). The question of standing involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

### i. Irreducible Constitutional Minimum of Standing

■ A private plaintiff, under separation of powers principles, must first establish that he satisfies the standing requirements imposed by the "case" or "controversy" provision of Article III of the United States Constitution. U.S. Const., art. III; *Wright,* 468 U.S. at 750–51, 104 S.Ct. 3315. Under the case or controversy requirement, each plaintiff must establish that he has standing to sue. *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). This "irreducible constitutional minimum" of standing requires a showing (1) that the plaintiff have suffered an "injury in fact"; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant; and (3) that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Each element of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof", i.e., with the manner and degree of evidence required at the successive stages of the litigation. *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130. The standing issue may be raised repeatedly at various "stages" in the litigation and the plaintiff's burden of proof changes depending upon the particular "stage" at which the

issued is addressed. *Id.* Thus, while at the pleading stage, general factual allegations of injury resulting from the defendants' conduct may suffice, a plaintiff must set forth by affidavit or other admissible evidence "specific facts" in order to survive summary judgment. *Id.* (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

### a) Injury in fact

■ An injury in fact, for standing purposes, is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual and imminent, and not conjectural or hypothetical. *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. The injury must be *concrete* in both a qualitative and temporal sense. *Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). The complainant must allege an injury that is "distinct and palpable," as opposed to merely "abstract," and the alleged harm must be "actual or imminent," and not "conjectural" or "hypothetical." *Whitmore,* 495 U.S. at 158, 110 S.Ct. 1717. Accordingly, allegations of possible future injury do not satisfy the requirement of Article III; a threatened injury must be "certainly impending" to constitute an injury in fact. *Id.*

■ As this Court has noted, "injury in fact is not 'an ingenious academic exercise in the conceivable,' but ... requires, at the summary judgment stage, a factual showing of perceptible harm." *Friends of the Earth, Inc. v. Crown Central Petroleum,* 1995 U.S. Dist. LEXIS 1633, at *23 (E.D.Tex. Sept. 22, 1995), *aff'd,* 95 F.3d 358 (5th Cir.1996) (quoting *Defenders of Wildlife,* 504 U.S. at 556, 112 S.Ct. 2130). A plaintiff may not simply "imagine circumstances" in which he would be harmed by a violation. *See United*

*States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ("SCRAP"). Moreover, standing must be addressed on a claim by claim basis. *James v. City of Dallas,* 254 F.3d 551, 563 (5th Cir.2001).

### b) *Traceability*

 The second element of standing requires proof of a causal connection between the injury in fact and the conduct complained of. *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. The injury has to be fairly traceable to the challenged action of the defendants, and not the result of the independent action of some third party not before the court. *Id.* In other words, causation focuses on the relationship between the alleged violation and the alleged injury. *Allen,* 468 U.S. at 753 n. 19, 104 S.Ct. 3315. In this regard, Defendants correctly argue that each plaintiff must show that he has suffered injury in fact caused by Defendants' violation of each regulation listed in each claim set forth in paragraph 81 of the Second Amended Complaint. The injury in fact test "requires that the [party] seeking review be among the injured." *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130; *Allen,* 468 U.S. at 752, 104 S.Ct. 3315.

In *Crown Central,* the Fifth Circuit explained the application of the "fairly traceable" standing element. 95 F.3d 358, 359 (5th Cir.1996). The issue of standing in *Crown Central* arose from the complaints of individuals who allegedly bird watched and fished at a lake "some 18 miles and three tributaries" from the source of the alleged violation of the Clean Water Act. *Id.* The Fifth Circuit first found that the waterway at issue was "too large to infer causation solely from the use of some portion of it." *Id.* at 361. The court then emphasized that there was no competent evidence that the defendant's alleged discharges in violation of the Clean Water Act had "made their way" to the lake that the plaintiffs used or that the discharges would "otherwise affect" the lake. *Id.* The Fifth Circuit held that, when the plaintiffs have "little more than surmise" to connect the occurrence of an alleged violation to the location of their alleged injury, the court cannot "assume that an injury is fairly traceable to a defendant's conduct solely on the basis of the observation that water runs downstream." *Id.* at 362.

### c) *Redressability*

 Under the third element for standing, it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision. *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. This element focuses on the relationship between the remedy requested and the alleged injury. *Allen,* 468 U.S. at 753 n. 19, 104 S.Ct. 3315. It necessarily follows that if a Plaintiff cannot establish that he has been injured by a specific remote violation of the Regulation elsewhere on the pipeline, he cannot seek redress for that violation.

This principle is illustrated in *Conservation Law Found. of New England, Inc. v. Reilly,* 950 F.2d 38 (1st Cir.1991), a case very similar to the case *sub judice.* Much like the plaintiffs in this case, the *Conservation Law* plaintiffs, a conservation organization with localized injuries in New England, sought nationwide injunctive relief, based on a theory of a centralized failure to assess and evaluate hazardous waste sites. *Conservation Law,* 950 F.2d at 40. As the plaintiffs argue in this case, the district court in *Conservation Law* held that the plaintiffs there had standing to "pursue the legal rights of the general public and request a remedy for all of the national sites." *Conservation Law Found. of New England, Inc. v. Reilly,* 743 F.Supp. 933, 940–41 (D.Mass.1990), *rev'd,* 950 F.2d 38 (1st Cir.1991).

The First Circuit, in reversing the district court, divided the plaintiffs' claims into two categories: (1) those seeking to remedy violations to which they had been exposed; and (2) those seeking to remedy geographically remote violations to which the plaintiffs had not been exposed. *Conservation Law*, 950 F.2d at 41. The court found standing for the first category and rejected standing for the second, finding that the plaintiffs could not adjudicate and remediate remote violations based on "nonindividualized, abstract" and "public interest" concerns. *Id.* at 43. Specifically, the court found that the individual members of the plaintiff environmental organizations had standing with respect to the sites in their immediate vicinity to which they were exposed. *Id.* at 42. The plaintiffs lacked standing, however, with respect to remote facilities because they could not show that they had suffered injury directly traceable to the alleged illegal conduct, namely the defendant's failure to assess and evaluate federal hazardous waste sites throughout the United States. *Id.* at 42. According to the appellate court, the lack of "personal stake" in the case was of particular concern. *Id.* at 43. Plaintiffs sought relief "far beyond any injury they [had] established." *Id.* at 43. While plaintiffs demonstrated injury as to sites in their immediate vicinity, the court held that plaintiffs were merely "concerned bystanders" as to the alleged remote violations and, therefore, lacked standing to obtain nationwide injunctive relief. *Id.* at 42. Granting the nationwide relief sought by the plaintiffs would have required ordering hundreds of discrete and separate evaluations on the part of hundreds of separate EPA regional offices. *Id.* at 43.

In *Alaska Center for the Environment v. Browner*, 20 F.3d 981 (9th Cir.1994), the Court of Appeals for the Ninth Circuit expressly distinguished the facts before it from those in *Conservation Law*. In *Browner*, a case Plaintiffs rely heavily on, four environmental organizations with members located throughout Alaska sued for an injunction requiring the EPA to establish "total maximum daily loads" ("TMDLs") for Alaska waters under the Clean Water Act ("CWA"). *Browner*, 20 F.3d at 982. The CWA required a prioritization of the TMDLs on the waterways throughout the state based on the severity of pollution and the uses to be made of the waters. *Id.* at 985–86. The EPA moved for summary judgment, arguing that plaintiffs had demonstrated injury only with respect to a limited number of streams. *Id.* at 984. The Ninth Circuit Court of Appeals, however, concluded that for CWA regulatory purposes, all waters within a state are interrelated. *Id.* at 985. Also, the court noted that the relief sought involved a single EPA office and the performance of one duty—that of establishing TMDLs—and that, because the waterways were interrelated, the EPA would not have to perform hundreds of discrete and separate evaluations on the part of hundreds of separate EPA regional offices as in *Conservation Law*. *Id.* at 985–86. In affirming the district court's order recognizing the *Browner* plaintiffs' standing and requiring the APA to establish the TMDLs on a state-wide basis, the *Browner* court opined that, "[u]nlike the plaintiffs in *Conservation Law*, plaintiffs in this case have also demonstrated representation and injury throughout the entire area for which they seek relief" due to the interrelatedness of the Alaskan waters. *Id.* at 986. Plaintiffs claim Defendants' pipeline is so likewise interrelated, or interconnected, that standing should be granted.

*ii. Prudential Standing Under Bennett v. Spears*

In addition to the constitutional requirements, prudential standing limita-

tions prevent a court from adjudicating "questions of broad social import where no individual rights would be vindicated and ... limit access to the federal courts to those litigants best suited to assert a particular claim." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Like their constitutional counterparts, these judicially self-imposed limits on the exercise of federal jurisdiction are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197. However, unlike their constitutional counterparts, they can be modified or abrogated by Congress. *Id.*, at 501, 95 S.Ct. 2197.

Plaintiffs cite to *Bennett v. Spear*, 520 U.S. 154, 163, 117 S.Ct. 1154, 137 L.Ed.2d 281(1997), to support their position that prudential standing allows that "any person" may sue to protect the environment based on violations of the act, and that not every plaintiff need show standing as to each and every individual claim. In *Bennett*, irrigation districts receiving water from the Klamath Irrigation Project and operators of ranches in those districts, filed an action under the citizen suit provision of the Endangered Species Act ("ESA") to challenge the biological opinion that was issued by the Fish and Wildlife Service, in accordance with the ESA. *Bennett*, 520 U.S. at 157, 159, 117 S.Ct. 1154.[7] Prior to *Bennett*, no party had before attempted to use a citizen suit provision in order to challenge the overprotection of the environment to the detriment of that party. The issue before the *Bennett* court was whether the petitioners, who had economic and other interests affected by the biological opinion, had standing to seek judicial review of the biological opinion under the citizen suit provision of the ESA. *Id.*[8]

The district court dismissed the action because the petitioners' interests were outside the "zone of interests" that were meant to be protected by the ESA and thus, they lacked standing to bring suit. *Id.*, at 160–61, 117 S.Ct. 1154. The Ninth Circuit Court of Appeals affirmed, stating that the petitioners were outside the class of people that could obtain relief under the ESA and that only those that allege an interest in the preservation of endangered species could maintain a suit under the citizen suit provision. *Id.*, at 161, 117 S.Ct. 1154. The United States Supreme Court granted certiorari and addressed two questions: (1) whether the "zone of interests" test applies to claims brought under the citizen suit provision of the ESA; and (2) if so, whether the petitioners have standing notwithstanding the fact that they seek to advance economic rather than environmental interests. *Id.*

Justice Scalia, writing for the majority, examined the broad language of the citizen suit provision and concluded that the prudential zone of interests expanded to include the ranchers, even though their interests were economic. *Id.*, at 164, 117 S.Ct. 1154. The Court concluded that the language of the ESA citizen suit provision providing that "any person may commence a civil suit," to be extremely broad when compared with other language that Congress normally uses. *Id.*, at 164–65, 117 S.Ct. 1154. The Court noted that in other environmental statutes, Congress used more restrictive formulations, such as "[any person] having an interest which is or may be adversely affected." In fact,

---

**7.** The biological opinion was issued in accordance with the ESA of 1973, 87 Stat. 884 (codified as amended at 16 U.S.C. 1531–1544 (1994)).

**8.** The suit was also brought under the Administrative Procedure Act, which is not at issue in this case.

the Court held that the term "any person" should be construed not only to include environmentalists, but also those asserting overenforcement of the ESA. *Id.*, at 166, 117 S.Ct. 1154.

 While finding that the citizen suit provision granting "any person" a right to sue is remarkably broad, the Court acknowledged the importance of applying protections to create a more restrictive interpretation that is less prone to abuse. In that regard, the *Bennett* Court specifically opined that where Congress authorizes a citizen to sue for an injunction, prudential standing expands to the full extent of Article III. *Id.* at 159–69, 117 S.Ct. 1154. However, as implicitly noted by the Court, Article III does not disappear. All statutes operate against the backdrop of the Constitution. Article III requires standing, and standing requires proof of injury. The plaintiffs in *Bennett* demonstrated that they had in fact been injured; the Court was merely called upon to determine if their injuries fell within the prudential "zone of interests" contemplated by the statute. Likewise, Plaintiffs in this case cannot try to simply legislate their way around Article III standing requirements; any such interpretation would violate Article III. As in *Bennett,* the citizen suit provision of the PSA enables Plaintiffs, as "any person," to bring a suit *"if, and only if"* they are able to meet minimum Article III standing requirements.

### APPLICATION OF LEGAL PRINCIPLES TO FACTS AT HAND

*Plaintiffs' "Law of the Case" Argument*

Plaintiffs initially argue that, in denying Defendants' motion to dismiss, this Court already considered and determined that Plaintiffs have Article III standing to pursue their requested injunctive relief pursuant to the citizen suit provision of the PSA.

Plaintiffs further allege that the Court did not limit its standing ruling to alleged violations occurring on Plaintiffs' properties. Plaintiffs incorrectly state, however, that this Court's denial of a motion to dismiss conclusively established standing for every subsequent phase of the litigation. In fact, a later order issued by this Court specifically noted that the jurisdictional issue may be raised at any time and expressly contemplated that the matter of Plaintiffs' standing would be reconsidered following the completion of discovery. Order, Jul. 29, 2003. At a hearing on the same matter, Judge Hannah articulated:

I think we have all admitted that I have jurisdiction to at least part of this case, at least to the Plaintiffs that are named and to the properties they're complaining about. As to whether or not I have subject matter jurisdiction to the rest of the case is always a pending issue before this Court, and at some time I might very well decide that I do not have jurisdiction over the rest of the pipeline.

Hr'g Tr., Aug. 15, 2003.

 Moreover, Plaintiffs' assertions that this Court's order denying Defendants' motion to dismiss unalterably established law of the case that they have Article III standing to pursue injunctive relief on a system-wide basis is simply not accurate. According to Plaintiffs, the crux of their case—and from which they claim their Article III standing derives—is not the specific, ongoing violations occurring on Plaintiffs' properties and other locations throughout Defendants' pipeline, but rather, it is the source of these ongoing violations—Defendants' management philosophy of sacrificing pipeline integrity and regulatory compliance for increased profits. Plaintiffs argue that the specific evidence of leaks, corrosion and other hazardous conditions of Defendants' pipeline are "symptoms" of the real problem at Defen-

dants' headquarters that extend system-wide, causing damage not only to Plaintiffs' properties, but approximately 1,000 miles of pipeline interconnected with, and in close geographic proximity to the pipeline indexes running through Plaintiffs' properties. However, Judge Hannah did not absolve Plaintiffs from geographically pinpointing specific violations. To the contrary, Judge Hannah expressly recognized that Plaintiffs would have to identify the "particular" location along the pipeline impacting plaintiffs to establish any violation of a regulation. *Id.*

### Evidence of Plaintiffs' Alleged Injuries on their Own Properties

To that end, Plaintiffs first claimed they were injured by the condition of the pipelines on their individual properties. Specifically, Plaintiffs allege in their Second Amended Complaint, upon which the instant summary judgment motion is based, that "because of the deterioration of the pipelines running through their properties and Gulf South's failure to promptly address their concerns and perform adequate repairs, Plaintiffs no longer feel safe *on their own properties* and as a result have lost the total and full use and enjoyment of their properties." Pls.' 2d Am. Compl., at 42, § 84 (emphasis added). Plaintiffs also claim they "suffered and will continue to suffer irreparable harm because of the constant risk and threat of injury and imminent harm to which they are exposed" cause by the alleged "dangerous condition and disrepair of the pipelines *on the Plaintiffs' properties.*" Pls.' 2d Am. Compl., at 43, § 86 (emphasis added). Plaintiffs claim that violations of the pipeline safety regulations exist and are readily apparent on each Plaintiffs' property. Plaintiffs' affidavit and deposition testimony reveal the extent of Plaintiffs' alleged injuries:

#### i. Plaintiff Wyble

Joseph Wyble and his family live and recreate on their 36.4–acre Trinity County, Texas property. Index 70 of Defendants' pipeline runs through Wyble's property. Wyble stated that Defendants have failed to repair and cover a 20–25 foot section of exposed, uncoated, and corroded pipe in an eroded area below a spillway for over three years. He stated that Defendants' pipeline is at an unsafe depth of cover, sitting only 12 inches deep in some places. Mr. Wyble claimed there are improper and insufficient markers to determine the path of the pipeline across his property and that he has been given no information from Defendants about what to do if an emergency arises. He testified that one rectifier on his property was inoperative for 3–5 months, that the right of way was not cleared for 9–10 years, and that at least one leak occurred on the pipeline about 300 feet from his house.

Plaintiff Wyble claimed to be concerned, apprehensive and fearful that the dangerous conditions on his property may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to Plaintiff and his family. Mr. Wyble testified that he and his family are especially fearful of the pipeline because they live on the property where the pipeline is located and they must cross the pipeline every time they enter or leave the property. Due to their fears and concerns, Plaintiff Wyble claimed that he and his family have limited their use of the property where the pipeline is located and plan to move their home away from the pipeline during the summer of 2004.

#### ii. Plaintiff Hames

Robert Hames and his family use their 52–acre Shelby County, Texas property for

recreation, enjoyment and hunting. Plaintiff Hames' daughter and her family live on the adjoining property. Index 63 of Defendants' pipeline runs through Hames' property. Mr. Hames stated that there is evidence of erosion and soil settlement around or near the pipeline on his property. He claimed the property has not been properly maintained, that the pipeline is inadequately and improperly marked, and that there is shallow depth of cover in some locations on the property. Mr. Hames stated that corroded pipes exist on his property, and he lacks information from Defendant about the pipeline and what to do if an emergency arises.

Plaintiff Hames claimed to be concerned, apprehensive and fearful that the dangerous conditions on his property may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to Plaintiff and his family. Mr. Hames testified that he is especially fearful for the safety of his daughter's family who live on the adjoining property. Due to their fears and concerns, Plaintiff Hames claimed that he and his family have limited their use of the property where the pipeline is located and though he primarily bought the property for hunting, he is now afraid to hunt or allow others to hunt because of the risk of the pipeline.

### iii. Plaintiff Winston Land and Cattle

Winston Land & Cattle Company owns approximately 700 acres in Angelina County, Texas used for commercial timber and cattle operations. Index 59 of Defendants' pipeline runs through Winston's property. Simon Winston, as the representative of Winston Land & Cattle Co., stated that Defendants' pipeline is at an unsafe depth of cover, that there are washouts and erosion around or near the pipeline, and that line markers are inadequate and cannot be seen from one line market to the next.

Mr. Winston claimed that Defendants have failed to inspect and patrol the line and has failed to maintain the pipeline and right of way. He claimed that the right of way remains overgrown and that he has been given no information from Defendants about what to do if an emergency arises.

Plaintiff Winston claimed to be concerned, apprehensive and fearful that the dangerous conditions on Winston property may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to Plaintiff and his employees. Mr. Winston testified that timber operations on Winston property have become more difficult to manage because such activities as plowing, creating firebreaks, utilizing controlled burns and using heavy equipment must not be limited, restricted or redirected due to the risk of the pipeline. Due to his fears and concerns about the pipeline, Mr. Winston claimed that Winston has restricted the use of the property near the location of the pipeline and altered work on the property.

### iv. Plaintiffs Snider Industries and Snider Timberland

Snider Industries, LLP is the owner of approximately 568 acres in Gregg County and Upshur County, Texas. Snider Timberland, FLP is the owner of approximately 6,752 acres in Panola County, Texas and approximately 160 acres in Wood County and Upshur County, Texas. The primary use of the properties is timber operations. Index 1 of Defendants' pipeline runs through both of the Snider properties, and Index 391 runs through Snider Timberland's property.

Craig Parr, the representative of the Snider Plaintiffs, stated that Defendants' pipeline is at an unsafe depth of cover, and

the pipe is exposed and corroded in places on the Snider properties. Mr. Parr claimed there is an apparent lack of markers at some locations on the property, claimed Defendants have failed to patrol and inspect the pipeline, and claimed Defendants failed to give him information about what to do if an emergency arises.

Mr. Parr claimed to be concerned, apprehensive and fearful that the dangerous conditions on the Snider properties may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to him and those on the Snider properties. He testified that he is apprehensive because of the number of heavy logging trucks crossing the pipeline. Due to his fears and concerns, Mr. Parr claimed that logging operations on the Snider properties have been altered to avoid heavy logging trucks crossing areas where the pipeline is located, and he is cautious about how he uses or travels on the property near the pipeline.

### v. M. Kangerga & Bros.

M. Kangerga & Bros. owns approximately 8,000 acres primarily located in Rusk County, Texas. The property is used for farming operations, commercial timber operations, hunting, and recreation and enjoyment. Indexes 11 and 391 of Defendants' pipeline run through Kangerga's property. James Kangerga, the representative of M. Kangerga & Bros., stated that Defendants' pipeline is at an unsafe depth of cover, and the pipe is exposed and corroded on places on Kangerga property. Mr. Kangerga claimed that Defendants did not properly maintain portions of the right of way, and claimed he has not received information from Defendant about what to do if an emergency arises.

Mr. Kangerga claimed to be concerned, apprehensive and fearful that the danger-

ous conditions on his property may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to himself and those on his property. Due to his fears and concerns, Mr. Kangerga testified that he has decided to discontinue logging operations on the property until such time as he believes the pipeline has been made safe, and he is cautious about how he uses or travels on the property near the pipeline.

### vi. Plaintiff May

Robert May owns approximately 45 acres in Shelby County, Texas. The May family uses their property for commercial timber operations and recreation, including camping and hunting. The May family maintains a camper on the property for overnight hunting and camping trips. Index 63 of Defendants' pipeline runs through the May property.

Plaintiff May claimed that Defendants have not properly inspected and maintained the right of way, in that deer blinds and brush piles stand in the right of way. He stated that Defendants have failed to monitor and control external corrosion, noting that cathodic protection rectifiers were found inoperative or turned off and control boxes unlocked. He stated that Defendants' pipeline is at an unsafe depth of cover in some locations on the property, that there are improper and insufficient markers to determine the path of the pipeline across his property and that he has been given no information from Defendants about what to do if an emergency arises. Plaintiff May testified that he became very concerned about the condition of the pipeline running through his property because a gas valve station located on his property was leaking. The soil had settled around the stem, the valve station

was full of water, and gas bubbles were visible evidencing a leak.

Plaintiff May claimed to be concerned, apprehensive and fearful that the dangerous conditions on his property may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to Plaintiff and his family. Due to their fears and concerns, Plaintiff May claimed that he and his family have limited their use of the property near the pipeline and have abandoned plans to build a camp house. He testified that he further plans to limit certain methods of forest management on the property. Finally, he also believed that Defendants' failure to maintain the right of way markers and boundaries and its unauthorized expansion of the right of way has caused the loss of timber producing acreage.

### vii. Hemby Living Trust's Property

The Hemby Living Trust owns approximately 1,100 acres in Panola County and Rusk County, Texas. The property is used for ranching operations, timber operations, hunting, camping, and for recreation and enjoyment. Terry McKenzie and his wife, along with Mrs. Hemby, reside on the property. Index 391 of Defendants' pipeline runs through Hemby property.

Terry McKenzie, the representative of Hemby Living Trust, stated that Defendants' pipeline is at an unsafe depth of cover, and the pipe is exposed and corroded on places on the Trust's property. Mr. McKenzie claimed that Defendants did not properly mark and maintain the pipeline and pipeline right of way, and claimed he has not received information from Defendant about what to do if an emergency arises.

Mr. McKenzie claimed to be concerned, apprehensive and fearful that the danger-

ous conditions on his property may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to himself and his family. Due to his fears and concerns, Mr. McKenzie testified that he has significantly restricted hunting on the property and does not allow hunting near the pipeline. In addition, Mr. McKenzie claimed he has delayed plans to build a new home on the property, and has concerns regarding plans to develop a blackberry farm on the property.

### viii. Plaintiff Kim R. Smith Logging, Inc.

The Smith property consists of 115 acres in Rusk County, Texas and is used primarily for timber, hunting, recreation and enjoyment. Index 391 of Defendants' pipeline runs through the Smith property. Kim Smith, the representative of Kim R. Smith Logging, Inc., stated that Defendants' pipeline is at an unsafe depth of cover, and the pipe is exposed and corroded in places on the Smith property. Mr. Smith claimed that Defendants improperly covered exposed and corroded pipe with bagged, powdered concrete, and that Defendants failed to provide adequate cathodic protection. He claimed that the pipeline right of way is overgrown, that leaks were found in the pipeline, and claimed Defendant failed to provide public and emergency pipeline information. Mr. Smith claimed to be concerned, apprehensive and fearful that the dangerous conditions on his property may have compromised the pipeline and that the pipeline may leak or rupture, resulting in a fire or explosion that may injure or otherwise cause imminent harm to Plaintiff. Due to his fears and concerns, Mr. Smith testified that he has limited the use of the property because of the risk posed by the pipeline. Mr. Smith has halted plans to subdivide and

sell the property because he does not want anyone to build a house near the pipeline.

In addition, Plaintiffs point to evidence in the form of internal risk assessments and summary reports to show that the pipeline indexes running through Plaintiffs' properties are extremely old, contain numerous leaks, are highly corroded, are of low integrity altogether, and are in need of immediate repair. Based on the above evidence, Plaintiffs demonstrate sufficient injury in fact, traceable to Defendants, which harm could be redressed, as to the alleged violations running through their property for standing purposes.

*Plaintiffs' Apparent Abandonment of Alleged Violations in Other States*

██ In their summary judgment Response, Plaintiffs state that they "do not seek injunctive relief to correct the specific violations on the out-of-state pipeline indexes." Pls.' Resp., at 3. While appearing to abandon their out of state remote violation claims, Plaintiffs expressly limit their requested remedy for alleged statutory violations to those that "exist on the pipeline indexes that cross their properties, pipeline indexes that interconnect with Plaintiffs' pipeline indexes ... and pipeline indexes in Texas which expose Plaintiffs to danger." *Id.*, at 2. Plaintiffs' Response further narrows the scope of Plaintiffs' claims to the "1,000 miles of pipeline interconnected with the lines that cross Plaintiffs' properties in Texas." Id. at 2, 93.

Although Plaintiffs submit new affidavits that attempt to bolster Plaintiffs' pleadings and previous testimony concerning injury in fact for remote violations in East Texas, those affidavits do not contain any facts that would support a claim that Plaintiffs have suffered injury in fact traceable to any alleged violation occurring in Louisiana, Mississippi, Alabama or Florida. In light of the apparent abandonment of the out of state claims and the lack of evidence to the same, Defendants are entitled to summary judgment on Plaintiffs' claims for violations as to the remote violations in Louisiana, Mississippi, Alabama and Florida.

*Plaintiffs' Claims as to Indexes in Close Proximity to their Property*

The problem the Court is presented with is that Plaintiffs apparently no longer seek redress for alleged injuries on their own properties. Until February, 2004, Plaintiffs' pleadings and evidence focused on their claimed loss of enjoyment of their own properties. Plaintiffs' deposition testimony until February, 2004 centered on the loss of enjoyment and use to their own properties. No plaintiff testified that they were fearful while traveling to East Texas counties. When specifically asked how alleged violations on someone else's property had affected them, Plaintiffs either expressly denied that they were affected by any condition other than on their own property, or admitted that any fears were just "speculation." A sampling of the deposition testimony on the subject illustrates this fact.

### i. *Plaintiff Wyble*

As to injuries not on his property, Wyble initially admitted that remote violations have not caused any of his injuries. In his deposition, Plaintiff Wyble asserted that, except as to his neighbor's property, there was no condition on the pipeline on anyone else's property, whether in Texas or in any other state, that caused him to lose the use of his property. He testified that neither the condition of the right-of-way nor the lack of public education in any other state had affected his use of his own property. Plaintiff Wyble thought that a "surge" on the line in Florida might "possibly" affect the pipe on his property, but admits that the possibility of the "surge" has not affected his use and enjoyment of his property.

### ii. Plaintiff Hames

As to injuries not on his property, Plaintiff Hames initially admitted that remote violations have not caused any of his injuries. Plaintiff Hames testified that he had no knowledge or complaint about the condition of the pipeline in any state besides Texas. Plaintiff Hames testified that he had not been injured in any way because of the condition on the pipeline in any other state, and that he has not been affected by the condition of Defendants' pipeline on someone else's property in Texas.

### iii. Plaintiff Winston Land & Cattle

As to injuries not on Winston property, Mr. Winston initially admitted that remote violations have not caused any of Winston's injuries. He testified that he knew nothing about the condition of the pipeline in Louisiana, Mississippi, Alabama, Florida or elsewhere in Texas that affects the use and enjoyment of Winston's property.

### iv. Plaintiffs Snider Industries and Snider Timberland

As to injuries not on the Snider properties, Mr. Parr initially admitted that remote violations have not caused any of Sniders' injuries. He testified that he did not have knowledge of any violations of Regulations by Defendants in Louisiana, Mississippi, Alabama, or Florida. He stated there was nothing about the condition of the pipe in any other state that had changed the way the Snider companies used their properties. He has merely a "speculation" that the pressure of the gas in the pipeline elsewhere might cause a problem with the gas pressure on the Snider properties, but acknowledged that this possibility is "fairly remote." Mr. Parr knows of nothing that might happen in another state, other than his speculation about gas pressure, that would affect the safety of the pipe on the Snider properties. Mr. Parr stated that the condition of the right-of-way on other properties has not affected Sniders' use of its properties.

### v. M. Kangerga & Bros.

As to injuries not on Kangerga property, Mr. Kangerga initially admitted that remote violations have not caused any of his injuries. He testified that there was "nothing" the plaintiff had been prevented from doing on its property because of the pipeline. He stated that (1) he knows of no violations by Defendants in any other state; (2) there was nothing about the condition of the pipe or alleged PSA violations in any other state that has injured the Kangerga's property, or changed the use of such property, and (3) the condition of the pipe elsewhere in Texas has not injured or caused Kangerga to change any usage of the property.

### vi. Plaintiff May

As to injuries not on May's property, Mr. May testified that he believed there is a "chance" that an explosion in another state might affect his property, but he admitted that the idea is "far fetched." He did not claim that this concern caused him to change use of his property.

### vii. Hemby Living Trust's Property

As to injuries not on Trust property, Mr. McKenzie, as representative of the Hembly Living Trust, initially expressed concern because of the condition of the right-of-way and pipeline in Florida and other states. His expressed concern was that corrosive agents might "years from now" possibly get from Florida to his property in Texas.

### viii. Plaintiff Kim R. Smith Logging, Inc.

As to injuries not on the Smith property, Mr. Smith, as representative of Kim R. Smith Logging, Inc., initially testified that

he knew of no injury that his company had suffered because of the condition of the pipeline in Louisiana, Mississippi, Alabama, and Florida. Later, he testified that, while he had no information about the existence of any violation of the PSA in Florida, he believed that, if the pipeline were "over pressure" in Florida, it could be a problem on his property in Texas. He stated that his concern regarding "over pressure" had not affected how the company used the property, including for timberland. While he stated the concern might prevent him from developing his property sometime in the future, he acknowledged that he had made no "concrete" plans to do so that he had to change.

Moreover, in Plaintiffs' Answers to Interrogatories dated as late as January 9, 2004, Plaintiffs described only the loss of use and enjoyment to their own properties. Nevertheless, in their summary judgment response, Plaintiffs expand the scope of their claims beyond that of their own properties to "those other pipeline indexes in Texas which expose Plaintiffs to harm and injury because Plaintiffs travel to work, school and visit family and friends in counties where the indexes are located." Pls.' Resp., at 2, 93. Plaintiffs attached to their Response new "evidence," affidavits taken days before the filing of Plaintiffs' response, alleging Plaintiffs have become more "observant, cautious, and fearful" regarding their use of other properties in East Texas through which the pipeline traverses.

■ However, when they filed their summary judgment response, Plaintiffs did not seek leave to amend their pleadings. Later, when they tried to do so, on the eve of the summary judgment hearing, the Court denied Plaintiffs leave for the reasons expressed above. A failure to allege injury on the face of the complaint in connection with a claim for relief deprives the plaintiff of standing to bring that claim. *See Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir.1989). Defendants objected to the proffered evidence and the Court granted their Motion to Strike the Plaintiffs' summary judgment evidence that related to any "new" theory of standing. Plaintiffs find themselves in the unenviable position of having apparently abandoned claims of remote injuries in other states, while presenting "new" evidence for a claim that is not before the Court.

In any event, Plaintiffs face the same problem with the remote violations in East Texas that they did with alleged remote violations that occurred in Florida, Mississippi, Alabama and Louisiana. Plaintiffs seek, in their summary judgment injunctive relief to redress remote violations, i.e., a remedy that would require the assessment, repair, and replacement of segments of pipeline located on remote properties throughout East Texas. Yet the Second Amended Complaint, which is the live pleading before the Court, does not allege that any of the violations of regulations occurring on properties remote from the Plaintiffs are causing them any harm. Rather, Plaintiffs' complaint focuses exclusively on the alleged violations on their own properties to establish Plaintiffs' injuries. Plaintiffs' Second Amended Complaint does not alleged that Plaintiffs' enjoyment of remote areas is lessened, or that violations in remote areas have caused them harm or deprived them of the use of their own properties. As in *Conservation Law,* Plaintiffs are merely "concerned bystanders" in that they "seek relief far beyond any injury they can establish." *Conservation Law,* 950 F.2d at 42–43. Accordingly, because they have no evidence of a causal connection between any specific remote violations and their alleged injuries under their pleaded theory, and because the "new" evidence sought to be intro-

duced has been stricken, Plaintiffs have no standing to obtain an injunction to remedy violations occurring on remote properties, whether five states or five counties away from their own properties.

■ In an effort to keep their remote claims alive, Plaintiffs focus the Court's attention on the sought "scope of the remedy" for the alleged system-wide violations of the PSA and its prescribed regulations. In particular, Plaintiffs assert that the Court can remedy remote violations because Defendants' pipeline is allegedly "interconnected" and it would be "contrary to Congressional intent and directive to permit individual plaintiffs—or the Court—to address only a fraction of [Defendants'] pipeline". Pls.' Resp., at 90. Basically, Plaintiffs argue that, under *Browner*, the case can proceed to trial, based on Plaintiffs' individual standing and individual showings of violations on their own properties. Then, after a full trial on the merits, the Court can address the proper scope of the remedy concerning the alleged system-wide operational failures extending throughout Defendants' pipeline. However, this is putting the cart before the horse. Standing is a jurisdictional requirement that focuses on the *party* seeking to get his or her complaint before a federal court and not on the *issues* he or she wants to have adjudicated. *James v. City of Dallas*, 254 F.3d 551, 562 (5th Cir.2001).

Furthermore, Plaintiffs' reliance on *Browner* in this regard is misplaced. Plaintiffs analogize their case to *Browner*, contending that the pipeline at issue is one interconnected item, just as the Alaskan waterways in *Browner* were one interrelated identity. In this regard, Plaintiffs liken a segmented pipeline, with regulators and pressure valves at various intervals, with fluid water. The analogy is not the same. Pollutants can infiltrate a creek or stream and thereby permeate an entire waterway

due to the fluid nature of water. It does not follow that a problem on one of Defendants' indexes in Victoria County will flow to and create a problem in Upshur County. Defendants present evidence that pipelines are designed so that, if a problem arises, the pipeline can be shut down at one segment while the other segments are not affected at all.

Moreover, Plaintiffs' contend that, like the source of the violations in *Browner*, *i.e.*, a single EPA office that failed to perform duties mandated by statute, Defendants' corporate headquarters form one entity from which Defendants' policies and practices evolve. Thus, according to Plaintiffs, standing is based not on where the violations occur, but rather from the "source" of the violations, *i.e.*, Defendants' management philosophy that extends throughout the pipeline. This approach overly simplifies the relief Plaintiffs actually seek. Although Plaintiffs suggest that all violations on the pipeline—such as the failure to repair a leak or maintain a right-of-way—are symptomatic of a company policy and ethic that actually occur at corporate headquarters, Plaintiffs actually target the pipeline system-wide. Contrary to Plaintiffs' assertions, this case does not involve, as in *Browner*, a single office and the performance of one duty, *i.e.*, establishing TMDLs. Plaintiffs do not claim one violation. Plaintiffs claim sundry violations, including corrosion, depth of cover, and right-of-way issues, that will require hundreds of discrete and separate evaluations on the part of many of Defendants' offices and across many miles of pipeline and encompass more than a management philosophy centered at Defendants' headquarters.

## CONCLUSION

This Court declines to step beyond the constitutional mandates of Article III to

grant Plaintiffs standing as to remote violations for which they have no direct injury. Plaintiffs demonstrate sufficient injury in fact, traceable to Defendants, which harm could be redressed, as to the alleged violations running through their property for standing purposes. The Court confers standing to Plaintiffs only to that extent.

Plaintiffs have apparently abandoned their claims as to the remote violations in Alabama, Florida, Louisiana and Mississippi. Likewise, because Plaintiffs have no evidence of a causal connection between any specific remote violations on other lands in Texas and their alleged injuries under their Second Amended Complaint, Plaintiffs have no standing to obtain an injunction to remedy violations occurring on remote properties, whether five states or five counties away from their own properties.

In this case Plaintiffs, on a variety of theories, have sought unprecedented and extraordinary relief against Defendants ultimately asking the Court to appoint a Special Master to evaluate, oversee, and in a sense run the business of Defendants' pipeline. The Court declines to make such an extraordinary use of its judicial power which would require a disregard of the long established constitutional principles of standing. It is not the province of this Court to determine what Defendants' management philosophy should be or to run its company. It is not the judiciary's role to remedy every problem imaginable as to Defendants' pipeline. Those broad regulatory issues are better left to the province of the legislative branch and the agency which oversees this particular industry.

Accordingly, the Court **GRANTS** Defendants' Partial Motion for Summary Judgment on Article III Standing with Respect to Remote Violations. It is **HEREBY ORDERED** that Plaintiffs' claims for injunctive relief, alleged in paragraphs 81 and 89–91 of the Second Amended Complaint with respect to Defendants' pipeline and operations in Louisiana, Mississippi, Alabama and Florida, as well as remote locations in Texas, are hereby **DISMISSED** with prejudice.